UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES ROBINSON,

Plaintiff,

v.

CBRE, INC.,

Defendant.

Case No. 24-11446
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [35]**

While working at CBRE, a real estate and construction company, James Robinson, an African American man, says he was promised a promotion that never came. Shortly after that unfulfilled promise, a client requested Robinson's removal from a construction project, leaving him with a less desirable position. Robinson believes these actions were taken because of his race and because he reported unlawful behavior to the company. So he filed this lawsuit against CBRE asserting discrimination, retaliation, and hostile work environment claims under 42 U.S.C. § 1981, Title VII, and Michigan's Elliot-Larsen Civil Rights Act (ELCRA).

The motion is fully briefed and does not require further argument. *See* E.D. Mich. LR 7.1(f)(2). The record is undisputed that CBRE had a legitimate, non-discriminatory reason for removing Robinson from a project at a client's request due to his performance issues and that this was not pretext for any discriminatory

animus. Thus, for the reasons that follow, the Court GRANTS CBRE's Motion for Summary Judgment (ECF No. 35).

**I.**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the facts in the record, and the reasonable inferences that can be drawn from those facts, in the light most favorable to Robinson, and presents them as such below. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

**II.**

Robinson started working at CBRE in June 2018 as a senior project manager. (ECF No. 35-5, PageID.1279, 1281, 1533.) In this role, Robinson managed construction projects on specific corporate client "accounts" by overseeing architects, engineers, and project funding. (*Id.* at PageID.1277.) For the first three years of his employment, he worked primarily on an account for Ford Motor Company. (*Id.* at PageID.1281.)

Then in 2021, his manager encouraged him to apply to a role on the Kellogg's account. (*Id.* at PageID.1281–1282.) Because it required "more responsibility" than a

senior project manager, Robinson hoped it would be a "growth opportunity" for his career. (*Id.* at PageID.1282–1283.) Kellogg's campus is located in Battle Creek, Michigan, on the west side of the state, but the person who had previously been in the role advised Robinson that he was only required to be in person in Battle Creek two days per week. (*Id.* at PageID.1285.) Excited about the opportunity, Robinson applied. He interviewed with Jason Schueller and David Thompson from CBRE, and Doug Laditka from the Kellogg's team. (ECF No. 35-4, PageID.11781179.) He received the job offer and accepted. (*Id.* at PageID.1180.)

Robinson began working on the Kellogg's account as a "senior project manager" in November 2021. (*Id.* at PageID.1474.) The project involved various construction improvements to Kellogg's buildings, upgrading lighting, landscaping, front entryways, bathrooms, and roofing. (ECF No. 35-5, PageID.1366; ECF No. 35-4, PageID.1211.) There were multiple CBRE and Kellogg's team members involved, but the main participants were Robinson and his manager, Jason Scheuller, from CBRE and Doug Laditka and Nick Dabrowski from Kellogg's. The reporting structure looked like this:




(ECF No. 35-5, PageID.1282, 1287; ECF No. 35-11, PageID.1979, 1983.)

Robinson had high hopes for the project. His manager, Schueller, told Robinson that he planned to promote him to a director position by the end of 2022. (ECF No.

35-5, PageID.1493.) And things started out on track. Robinson received positive feedback initially. (ECF No. 35-11, PageID.1995.) In June 2022, he even participated in a business leadership course aimed at "moving [minority employees] into leadership roles[.]" (ECF No. 35-5, PageID.1431–1434.)

But by August 2022, problems emerged. Kellogg's was not happy about perceived miscommunication and poor management on the project. On August 9, 2022, Laditka sent an email to Schueller: "This is the first time I would say I'm disappointed in CBRE. This is just one of a handful of issues with the kickoff of this project. We continue to have to hand hold and get in the weeds far more than necessary." (ECF No. 35-12, PageID.2090.) Schueller forwarded this message to Robinson. (*Id.*) On August 30, 2022, Laditka wrote to Robinson about other delays. (ECF No. 35-5, PageID.1408.)

Starting in September 2022, Schueller received "multiple" complaints from Kellogg's personnel concerning "the completion of projects that Mr. Robinson was working on, and his lack of on-site involvement in overseeing those projects." (ECF No. 35-6, PageID.1633–1635 ("He was not physically on site as needed for the project work that was being completed.") (CBRE HR Manager Jessica Nordstrand[1] deposition); (ECF No. 35-10, PageID.1918–1919 (Schueller deposition recalling "multiple conversations about [Robinson]'s ownership of projects and lack of communication . . . and his ability to be on site when needed . . . .").) Laditka was

[1] Robinson's briefing refers to Nordstrand by her maiden name, Bass (ECF No. 35-6, PageID.1567; ECF No. 36, PageID.2248).

frustrated that "[Robinson] wasn't on-site often enough to verify quality assurance and push the contractor [which] certainly affected the quality of the project." (ECF No. 35-11, PageID.1986.)

Robinson felt that he was trying to manage the project but Kellogg's "disregard[ed]" his opinions. (ECF No. 35-5, PageID.1506 ("[T]hey would brush over what I would say and just kind of move on to the next topic . . . It's like I wasn't even present, but I'm running the meeting."); (*id.* at PageID.1503 (expressing that Kellogg's "ignore[d] his point of view as the [Subject Matter Expert]" and "disregard[ed] [him] as the account [project manager] lead.").) He began looking for an internal transfer to a different CBRE project. (ECF No. 35-6, PageID.1661.)

By December 2022, the $2.5 million project was delayed and overbudget by $627,542. (ECF No. 35-5, PageID.1368.) From Robinson's perspective, the construction company assigned to the job, Schweitzer, was underperforming. (ECF No. 35-5, PageID.1369 (Robinson blamed "Schweitzer's inability to provide a comprehensive project schedule" causing "substantial operational and financial impact to Kellogg at HQ.").) Kellogg's agreed that Schweitzer was underperforming, but also faulted CBRE, and Robinson specifically, for failing to execute the project. (ECF No. 35-11, PageID.1986 ("I see it as a mix of both. Neither were meeting expectations.") (Laditka deposition); *id.* at PageID.2048 (when asked whether he could have done more to "address the Schweitzer problems," Laditka responded, "[t]hat's not my responsibility. That was CBRE and James' responsibility. That's why we hired them to deliver the project.").)

When Robinson's performance review came around, it was clear that he would not be getting promoted to the director position. (ECF No. 35-5, PageID.1501.) His manager, Schueller, listed both positive and constructive feedback, with the "recurring theme" that Robinson needed to "become better at communicating to the client and impacted employees what is happening within a project when it's happening" and that he "needed to take more ownership." (ECF No. 35-10, PageID.1943.)

More problems arose with the Kellogg's project in the new year. In January 2023, CBRE was overseeing the nearly completed restroom construction, but the ADA automatic door openers had not yet been installed. (ECF No. 35-5, PageID.1380.) Kellogg's was "upset" about this, especially because a wheelchair-bound employee worked on that floor and could not access the restroom. (ECF No. 35-11, PageID.2078.)

Around this same time, late January 2023, Kellogg's instructed Robinson to work on site five days a week. (ECF No. 35-10, PageID.1929.) But the 218-mile round trip made this difficult for him. (ECF No. 35-5, PageID.1496–1497, 1499.) CBRE offered to put Robinson up in a hotel near Kellogg's campus, but Robinson declined due to responsibilities at home. (*Id.*) The on-site requirement left Robinson feeling singled out because "[n]obody else had to come in five days a week but [him]." (ECF No. 35-5, PageID.1531.) CBRE added a senior director to the project, David Thompson, to support Robinson. (ECF No. 35-5, PageID.1350.)

These problems weighed on Robinson. On January 17, 2023, Robinson emailed Pam Pujo, a Diversity Equity Inclusion representative at CBRE, stating that "CBRE has not afforded me equitable opportunities to advance like my fellow colleagues . . . I am seeking equal treatment and would like to be afforded the same opportunities to advance in my career at CBRE like my fellow colleagues." (ECF No. 35-37, PageID.2229.) He noted that the issue was "DEI related." (*Id.* at PageID.2228.) On January 20, 2023, Robinson emailed Schueller and Nordstrand, for a "mental health" PTO day citing "the recent events and mental stress [he] ha[d] experienced over the last few weeks on the Kellogg Account . . . ." (ECF No. 35-22, PageID.2151.) Nordstrand approved this request and responded with information about the Employee Assistance Program, which Robinson used. (ECF No. 35-22, PageID.2150; ECF No. 35-5, PageID.1427.) On January 24, Robinson emailed Nordstrand to say that he was "being asked to assume the responsibilities of a Director without the associated compensation." (ECF No. 35-22, PageID.2149–2150.) The two of them had a phone call on January 30, 2023, to discuss the matter. (ECF No. 35-5, PageID.1427;1430–1431.) By that point, Nordstrand already knew that Kellogg's had verbally requested that Robinson be removed from the project. (ECF No. 35-6, PageID.1713.)

On February 1, 2023, Laditka sent a formal written notice requesting Robinson's removal from the Kellogg's account citing "continual issues not meeting project deadlines, a lack of communication and follow-through with handing off projects to operations, use of standard processes and procedures (playbook, budget

tool, etc[.]) and an overall lack of ownership." (ECF No. 35-26, PageID.2192.) The next day, CBRE informed Robinson that he was being removed from the account. (ECF No. 35-27, PageID.2194.)

After Robinson was removed, Kellogg's decided to bring on a director level position to the project instead of a senior manager. (ECF No. 35-10, PageID.1937.) In April 2023, Anton Johansen, a white man, became the director on the Kellogg's project. (ECF No. 35-4, PageID.1173, 1179.)

Meanwhile, Robinson applied to different client accounts at CBRE and landed on the Johnson Controls (JCI) account. It had the same salary ($125,000), same job title, and similar job responsibilities, but Robinson felt it was a "demotion" because there was "less responsibility" and his contract contained no 15% bonus , although he did get a performance bonus at the end of the year for his work on the project. (ECF No. 35-5,PageID.1516, 1527.) The role was fully remote which left him feeling "isolate[d]." (*Id.* at PageID.1512–1513.) Robinson applied to other accounts but did not receive any offers. (*Id.* at PageID.1514.) Eventually, in July 2023, he filed a charge of discrimination with the EEOC. (ECF No. 35-34.)

Then, from January 22, 2024, to June 25, 2024, Robinson took medical leave. (ECF No. 35-5, PageID.1360–1361; ECF No. 35-31.) While he was out, the JCI project had completed. (ECF No. 35-6, PageID.1764.) On May 31, 2024, while still on leave, Robinson filed this lawsuit alleging race discrimination and retaliation under Title VII, ELCRA, and 42 U.S.C. § 1981. (ECF No. 1.) After returning from leave, Robinson had 30 days to secure staffing on a client account, per CBRE policy. (*Id.* at

PageID.1762.) But he did not do so. On August 2, 2024, after he failed to obtain a new position on a client account, Robinson was terminated. (ECF No. 35-6, PageID.1763.)

**III. Discrimination Claims**

"We review claims of alleged race discrimination [and retaliation] brought under § 1981 and the Elliott-Larsen Act under the same standards as claims of race discrimination brought under Title VII . . . ." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).

When a plaintiff, like Robinson, cannot produce direct evidence of discrimination, courts apply the *McDonnell Douglas* burden-shifting framework. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that framework, Robinson has the initial burden of establishing a *prima facie* case of discrimination. *Id.* If he does so, the burden shifts to CBRE to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If CBRE satisfies its burden, then Robinson must "prove by a preponderance of the evidence that the legitimate reasons offered by [CBRE] were not its true reasons, but were a pretext for discrimination." *Id.* Pretext is established by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [CBRE's] action, or (3) that they were insufficient to motivate [CBRE's] action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "Pretext is a commonsense inquiry: did the employer [take adverse action against] the employee

for the stated reason or not?" *Id.* at 400 n.4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

But Robinson argues that the *McDonnell Douglas* framework should not apply, citing a recent dissent from a denial of a petition for a writ of certiorari from Justice Thomas in *Hittle v. City of Stockton, California*, 145 S. Ct. 759, 760 (Mar. 10, 2025). (ECF No. 36, PageID.2252–2253.) This is obviously not binding authority. And the Sixth Circuit has already rejected Justice Thomas's proposed approach. *See Kellar v. Yunion, Inc.*, 157 F.4th 855, 868 n.2 (6th Cir. 2025) ("Kellar argues that we should consider Justice Thomas's dissent from the denial of certiorari in *Hittle*. . . . We are bound by precedent that applies the *McDonnell Douglas* framework in this manner.").) Thus, this Court will analyze Robinson's claims under the *McDonell Douglas* burden-shifting framework.

To establish a *prima facie* case of race discrimination, Robinson must show that:

> 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). The parties focus on the adverse employment action element. "In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in

the terms or conditions" of employment." *Id.* (citing *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).)

Robinson claims that CBRE discriminated against him when it (1) required him to work on site five days a week; (2) failed to promote him to director; (3) removed him from the Kellogg's account; (4) hired him in a less desirable position; and (5) ultimately terminated his employment. (ECF No. 36.) The Court addresses each in turn.

**A. On-Site Work Requirement**

Kellogg's initially permitted Robinson to work remote two to three times a week. Then, in January 2023, Kellogg's required that Robinson work on-site five days a week. (ECF No. 35-10, PageID.1928–1931.) CBRE enforced the client's request for Robinson to work in person in Battle Creek, but spoke with Kellogg's to identify occasional days that Robinson could still work remote within that arrangement. (*Id.* at PageID.1933.) Because he was the only African American on his CBRE team assigned to the Kellogg's project and the only person subject to this requirement, Robinson believes this constituted racial discrimination. (ECF No. 36, PageID.2256.)

It is unclear whether requiring an employee to report on-site 100-miles from his home even constitutes an adverse action for a discrimination claim. Robinson cites no cases supporting that proposition. Nor does an in-person work requirement appear to meet the standard of a "materially adverse" change in his work conditions. "In the absence of an adverse employment action, a plaintiff cannot sustain a discrimination claim." *Loggins v. Costco Wholesale Corp.*, No. 17-2688, 2019 WL 2203120, at *4 (W.D.

Tenn. May 21, 2019) (citing *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 278 (6th Cir. 2018)).

**Legitimate, Non-Discriminatory Reason**

But even assuming Robinson established a *prima facie* case, CBRE had a legitimate, non-discriminatory reason for requiring Robinson to report on-site. Schueller explained that by January 2023, Doug Laditka and Nick Dombrowski, the team at Kellogg's, had "lost trust that [Robinson] was able to determine when he needed to be on site for his projects because he had missed several days that he should have been there." (ECF No. 35-10, PageID.1928–1931.) So Kellogg's "requested" that Robinson work at the job site in person to better monitor the construction work being done there. (*Id.*) And CBRE enforced that request, while also identifying days, when possible, to ask Kellogg's to permit Robinson to work from home. (*Id.* at PageID.1933.)

**Pretext**

Robinson has not challenged this legitimate, non-discriminatory reason for requiring his in-person attendance. So that means his discrimination claim under this first theory fails.

**B. Failure to Promote**

Next, Robinson brings a different theory of racial discrimination: that CBRE failed to promote him to director. He points to Schueller's previous statements encouraging him to "keep doing what [he's] doing" and insinuating that a promotion would follow. (ECF No. 35-5, PageID.1494.) Even Schueller testified that he was "trying to get [Robinson] to a director level at some point." (ECF No. 35-10,

PageID.1934.) And when Robinson was removed from the Kellogg's account, Kellogg's then hired a director—the very position he wanted.

The denial of a promotion qualifies as an adverse action. *See Jara v. Tennessee State Univ.*, No. 20-00131, 2022 WL 331276, at *24 (M.D. Tenn. Feb. 3, 2022) ("For purposes of Title VII, a failure to promote is an adverse employment action.") (citing *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999)).

But Robinson's *prima facie* case faces a major roadblock: the promotion he sought did not yet exist. No open director position existed on the Kellogg's account. And Schueller did not have sole authority to unilaterally create that position for Robinson. (ECF No. 35-10, PageID.1935.) He needed "funding approved from Kellogg's to have a director role" and agreement from CBRE's "People Team" and David Thompson. (*Id.*)

"An employment discrimination claim for failure to promote simply cannot stand absent proof that a position was available and that the employee applied for it." *Seifu v. Postmaster Gen., U.S. Postal Serv.*, No. 19-572, 2021 WL 4745416, at *8 (S.D. Ohio Oct. 12, 2021), *aff'd sub nom. Seifu v. Postmaster Gen. of United States*, No. 21-4068, 2022 WL 19835788 (6th Cir. Dec. 12, 2022). That is, CBRE did not deny Robinson a promotion at all since no position was available. *McClane v. Genesee Cnty. Rd. Comm'n*, No. 18-13774, 2020 WL 1323332, at *10 (E.D. Mich. Mar. 20, 2020) ("It is not discriminatory for an employer to decline to promote an employee to a nonexistent position.").

**Legitimate Non-Discriminatory Reason**

True, after Robinson was removed, Kellogg's created a director position. This was because Robinson did not work out. As Schueller explained, to create that position for Robinson, Kellogg's would have had to approve funding for the position and CBRE's People Team and other managers on the account would need to assess whether it was the right fit. (ECF No. 35-10, PageID.1935.) But Kellogg's said Robinson had "continual issues not meeting project deadlines, a lack of communication and follow-through," so it did just the opposite of approving funding for a promotion—it requested his removal from the account. (ECF No. 35-26, PageID.2192.) CBRE's decision to accommodate its client's demand constitutes a legitimate, non-discriminatory reason to not promote Robinson. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (finding company proffered legitimate reason for denying promotion because "[plaintiff's] performance record rendered her unpromotable to assistant manager" as supported by her manager's deposition and affidavit detailing "performance-related deficiencies.")).

Having provided a legitimate, nondiscriminatory reason for not promoting him, the burden now shifts back to Robinson to show that CBRE's proffered reason was pretextual for unlawful discrimination.

**Pretext**

Robinson says that Schueller's evaluation of his performance contained contrived negative statements used to justify denying the promotion. (ECF No. 36, PageID.2246.) But Robinson cites no evidence in support. And, in fact, the record

shows just the opposite. From August 2022 onward, Kellogg's was justifiably dissatisfied with Robinson's performance and communicated that to Schueller.

No jury could find in favor of Robinson on his failure to promote claim because he fails to show that CBRE's legitimate, nondiscriminatory reason for failing to promote him was pretextual.

**C. Removal from Kellogg's Account**

Robinson's next theory is that he was removed from the Kellogg's account because of his race. (ECF No. 36, PageID.2255.)

Robinson does not cite any cases or otherwise explain how removal from the Kellogg's account—especially when he was immediately placed on a new account with nearly identical compensation and less travel time—qualifies as an adverse action. That alone dooms his *prima facie* case. *See Loggins*, 2019 WL 2203120, at *4.

**Legitimate, Non-Discriminatory Reason**

But, even if Robinson could establish a *prima facie* case on this theory, CBRE had a legitimate, nondiscriminatory reason to remove him from the account—the client's dissatisfaction with his performance and explicit request for his removal. *See, e.g.*, *Yurasek v. Crossmark, Inc.*, 54 F. Supp. 3d 876, 884 (S.D. Ohio 2014) (finding company had legitimate, nondiscriminatory reason for terminating employee where company client "demanded that Plaintiff no longer represent them due to the clients' dissatisfaction with Plaintiff's performance."); *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 477 (6th Cir. 2017) ("Terminating an employee because he fails to perform satisfactorily is a legitimate and nondiscriminatory reason to end his

employment.") (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 588 (6th Cir. 2002)). Nordstrand clarified that it is "not uncommon for clients to request removal of employees." (ECF No. 35-6, PageID.1638.) In fact, Kellogg's had also removed Robinson's predecessor, who was white, for performance issues. (*Id.* at PageID.1640.)

**Pretext**

The record is undisputed that the Kellogg's project was delayed, over-budget, fraught with issues, and lacking in adequate on-the-job oversight. Robinson blamed those problems on Schweitzer, the construction company on the project. (ECF No. 36, PageID.2243.) Kellogg's was clear eyed about Schwitzer's shortcomings, but still faulted Robinson for failing to adequately "deliver" on the project. (ECF No. 35-11, PageID.1986 ("I see it as a mix of both. Neither were meeting expectations."); *id.* at PageID.2049 ("That was CBRE and James' responsibility. That's why we hired them to deliver the project.").) To establish that CBRE's stated reason was pretextual, Robinson needed to show that CBRE "made up its stated reason to conceal intentional discrimination," *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)—not simply that Kellogg's and CBRE judged his work too harshly.

Thus, this claim also fails as a matter of law.

**D. Demotion**

Robinson also asserts that moving from the Kellogg's account to the JCI account constituted a "demotion" and was another act of racial discrimination against him.

After his removal from the Kellogg's account, Robinson applied for other client positions at CBRE and was hired on the JCI account. (ECF No. 35-10, PageID.1938.) Robinson considers this to be a demotion because he did not have a similar guaranteed 15% bonus in his contract (although he did receive a bonus), and he was working fully remote and felt isolated. (ECF No. 35-3, PageID.1513, 1516–1517, 1527.) Otherwise, he had the same salary, same job title of senior project manager, same health benefits, and similar job responsibilities. (*Id.* at PageID.1517–1518.)

"Ordinarily, reassignments without changes in pay or in schedules are not sufficient to constitute an adverse employment action in discrimination claims." *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 23 (6th Cir. 2007). Here, it is unclear whether losing a guaranteed 15% bonus, but still receiving a bonus nonetheless is a "materially adverse change in the terms or conditions of . . . employment." *Id.* (citing *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). The parties do not flesh out their arguments on this point.

**Legitimate, Non-Discriminatory Reason**

Even if Robinson's move to the JCI account constitutes a demotion, CBRE proffers a legitimate, non-discriminatory reason for the change. He was removed from the Kellogg's account and, pursuant to CBRE's policy, Robinson had to apply to a new role. His manager, Schueller, helped him apply to and obtain the role on the JCI account and Thompson ensured that he would receive the same health care benefits in that role as he had on the Kellogg's account. (ECF No. 35-5, PageID.1518.)

**Pretext**

Robinson does nothing to challenge this proffered reason. Nor could he. Robinson's removal from the Kellogg's project and obligation to find a new project clearly had a basis in fact, motivated CBRE's action to put him on the JCI project, and was sufficient to motivate CBRE's action. So this claim also fails as a matter of law.

**E. Termination**

Robinson's final theory is that CBRE discriminated against him by terminating his employment on August 2, 2024. Termination is a paradigmatic "adverse action" in a discrimination case. *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007).

**Legitimate, Non-Discriminatory Reason**

Regardless, CBRE has a legitimate, non-discriminatory explanation for this too. CBRE has a company policy that when a project ends, employees typically have 30 days to get staffed on a different client project. As just discussed, this was the impetus (i.e., legitimate, non-discriminatory reason) for staffing Robinson on the JCI project. Nordstrand explained the process as follows:

> Typically, our normal process is we notify the employee that they are no longer needed on x account. And we try to give them, you know, at least a 30-day window of time to find a new role within CBRE, but it varies.

(ECF No. 35-6, PageID.1641.) This requires applying to internal job postings. (*Id.*) Because Robinson did not secure a new position in this time, his employment was terminated.

This is a valid business policy and non-discriminatory in nature and effect. As CBRE points out, Robinson's predecessor on the Kellogg's account, a white man, was removed from the account and then terminated after failing to get placed on another client account. (ECF No. 35-6, PageID.1641.) Robinson has not produced any evidence to suggest that his similar experience was discriminatory.

**Pretext**

Robinson does nothing to challenge this proffered reason. This claim also fails as a matter of law.

For the reasons stated above, Robinson's various theories of race discrimination fail as a matter of law.

**IV. Retaliation Claims**

Robinson also contends that he was retaliated against in violation of 42 U.S.C. § 1981 (Count I), Title VII (Counts III, IV), and ELCRA (Count III) (ECF No. 1, PageID.7–12.) He believes that he was removed from the Kellogg's account (which he says ultimately led to his termination) after reporting unlawful conduct.

**A. *Prima Facie* Case**

Since Robinson has no direct evidence of retaliation, the Court once again employs the *McDonnell Douglas* burden shifting framework. *Jackson*, 999 F.3d at 344; *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)).

To make out a *prima facie* case of retaliation, Robinson must establish:

(1) he was engaged in protected activity,

> (2) [CBRE] knew of the exercise of the protected activity,
>
> (3) he was subjected to adverse employment action, and
>
> (4) there is a causal link between the protected activity and the adverse employment action.

*Jackson*, 999 F.3d at 344 (reciting elements of the *prima face* case for retaliation under Title VII and ELCRA); *Bloomer v. Word Network Operating Co., Inc.*, 785 F. Supp. 3d 251, 271 (E.D. Mich. 2025) ("The elements of a retaliation claim under § 1981 are the same as under Title VII."). As above, the analysis of retaliation under each statute mirrors the other, so the Court will address these claims together and cite the case law interchangeably. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018).

**1. Protected Activity**

An employee engages in protected activity by "'oppos[ing] any practice' made unlawful under Title VII." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013); *see also Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 532 (6th Cir. 2021) ("Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination.") (citation omitted). A plaintiff need not complain "with absolute formality, clarity, or precision," but must allege more than a "vague charge of discrimination." *Jackson*, 999 F.3d at 345 (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)).

Robinson points to three instances of supposed protected activity. (ECF No. 36, PageID.2258.)

First, his email to Pam Pujo, the DEI Manager, on January 17 that he was "seeking equal treatment and would like to be afforded the same opportunities to advance in [his] career at CBRE like [his] fellow colleagues." (ECF No. 35-37, PageID.2229.) Although the email does not mention race, when read in context, appears to report racial discrimination. Thus, this report was protected activity.

Likewise, around January 30, 2023, Robinson and Nordstrand had a call to discuss Robinson's concerns about not being promoted. (ECF No. 35-5, PageID.1427;1430–1431.) During that phone call, Robinson says he mentioned his email to Pujo and complained about race discrimination. (ECF No. 35-5, PageID.1428–1429.) But Nordstrand recalls hearing only concerns about the "client work environment" and the perception that Schueller "promis[ed] [Robinson] a Director role." (ECF No. 35-6, PageID.1714.) Because there are conflicting stories about whether race discrimination was discussed on the January 30 call between Robinson and Nordstrand, at this stage, construing the facts in the light most favorable to Robinson, the Court considers it to be protected activity as well.

Finally, Robinson points to his January 20 email to Nordstrand (HR) and Schueller requesting a PTO day for mental health due to stress experienced on the Kellogg's account. (ECF No. 35-22, PageID.2151.) But Robinson's request for a mental health PTO day does not constitute protected activity because it mentions only work-related stress, not discrimination. *See Dandy v. Bluecross Blueshield of Tennessee, Inc.*, No. 18-6344, 2019 WL 3412601, at *4 (6th Cir. July 18, 2019) ("complaints about

general 'workplace concerns,' absent any alleged discrimination, do not amount to protected activity.").

**2. Notice**

Next Robinson must show "that the relevant decision makers knew of any alleged protected activity when they took [the] adverse action [.]" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1068–69 (6th Cir. 2015). He may do so through direct or circumstantial evidence. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). Merely speculating, however, that a decisionmaker knew about a protected activity is not enough to make that showing. *Hahn v. Gasper*, No. 20-403, 2021 WL 9666846, at *16 (W.D. Mich. Dec. 27, 2021), *aff'd sub nom. Caldwell v. Gasper*, No. 22-1031, 2022 WL 16629161 (6th Cir. Nov. 1, 2022).

HR manager Nordstrand clearly had notice of the January 30 phone call because she was a participant on that call. And it was at that time that Robinson told Nordstrand about his other protected activity—the email to Pujo. There is no evidence that other decisionmakers had knowledge of Robinson's protected activity. Because Nordstrand was the HR manager, however, it is possible she was authorized to communicate complaints to other decisionmakers. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 414 (6th Cir. 2021) ("An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized . . . to receive and respond to or forward such complaints to management."). So the Court will assume that the decisionmakers had knowledge of

Robinson's phone conversation with Nordstrand and, at that time, learned of his email to Pujo.

**3. Adverse Employment Action**

Robinson asserts that his removal from the Kellogg's account and later termination constitute adverse employment actions.

For purposes of retaliation, an adverse employment action is one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster*, 746 F.3d at 731 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). This standard is "less onerous in the retaliation context than in the anti-discrimination context." *Azuh v. Providence-Providence Park Hosp.*, 380 F. Supp. 3d 665, 676 (E.D. Mich. 2019) (quoting *Laster*, 746 F.3d at 731). And courts consider the "circumstances, expectations, and relationships" of the workplace when making this determination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 at 69.

Removal from the account and termination both qualify as adverse actions for a retaliation claim. *See Brelsford v. U.S. Foodservice, Inc.*, No. 06-13628, 2007 WL 2902873, at *3 (E.D. Mich. Oct. 2, 2007) (finding removal of salesperson from "lucrative account" to be adverse employment action for retaliation claim); *Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1033 (6th Cir. 2025) ("[Plaintiff] relies on her termination, which unquestionably qualifies as an adverse action.").

### 4. Causation

Finally, the Court must analyze whether there is a causal link between Robinson's complaints to Pujo and Nordstrand and his removal from the Kellogg's account and subsequent termination. Temporal proximity between the protected conduct and adverse action *can* be used to infer causation, but courts disagree on whether it is enough alone to satisfy the causation element of a *prima facie* case. *Compare Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity . . . constitute[s] evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation."), *with Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) ("Temporal proximity alone generally is not sufficient to establish causation.") (collecting cases). But "[i]n analyzing the facts in temporal proximity cases, [the Sixth Circuit] [has] always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010).

First, Robinson's removal from the Kellogg's account occurred on February 2, 2023. (ECF No. 35-6, PageID.1700.) This was close enough in time to his protected activity on January 17 and January 30 to infer that one event could have caused the other. However, there are other facts that cut against such an inference. As Nordstrand testified, Kellogg's requested Robinson's removal from the account on January 23, 2023, nearly one week *before* Robinson's phone call with Nordstrand.

(ECF No. 35-6, PageID.1614.) So even if CBRE decisionmakers knew about the call with Nordstrand (and at that time could have also learned of the email to Pujo), Kellogg's had already requested Robinson's removal.

Beyond this deficient temporal proximity, Robinson alludes to "[s]uspicious timing of new policies targeting [him]" perhaps like the in-person work requirement. (ECF No. 36, PageID.2256.) But that requirement was not initiated by CBRE; it was Kellogg's request that CBRE enforced. (ECF No. 35-10, PageID.1929.)

What about the other adverse action: Robinson's formal termination? That occurred in August 2024, over a year and a half after his protected activity. (ECF No. 35-6, PageID.1762.) This is too long from which to infer causation based on temporal proximity. *See Lucas v. Henry Ford Health Sys.*, No. 23-10953, 2025 WL 2777568, at *14 (E.D. Mich. Sept. 29, 2025) (one year between protected activity and firing too long); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation."). And Robinson points to no other evidence and makes no other argument to support that his termination had any connection to his one phone call and email complaining about race discrimination.

Thus, Robinson's retaliation claim fails at this step because he has not shown that his protected activity caused his removal from the Kellogg's account or his later termination.

**B. Legitimate, Non-Retaliatory Reason**

Even if Robinson stated a viable *prima facie* case for retaliation, CBRE argues that it did not remove Robinson from the Kellogg's account because he complained about discrimination. It removed him from the account because Kellogg's requested it do so based on his performance deficiencies. For the same reasons stated above, this is a legitimate, non-retaliatory reason for termination. *See Stubenrauch v. Citizens Fin. Grp., Inc.*, No. 16-12948, 2018 WL 6171768, at *7 (E.D. Mich. Nov. 26, 2018) ("It is well-established that poor performance is a legitimate, non-discriminatory and non-retaliatory reason for terminating an employee's employment.") (citing *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007)).

And CBRE says Robinson was terminated after his JCI project completed and he did not find another role at CBRE. This is the same policy as discussed above. For those same reasons, the Court finds this is a legitimate, non-retaliatory reason for his termination.

**C. Pretext**

Once again, Robinson has done nothing to call this rationale into question. (*See* ECF No. 36, PageID.2259.) Thus, his retaliation claim fails.

**V. Hostile Work Environment**

Robinson does not specifically list a hostile work environment claim as a Count in his complaint, but includes it as an allegation. (ECF No. 1, PageID.14 ("The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating,

hostile, and/or offensive work environment as alleged in the statement of facts.”). Both sides have briefed the issue, so the Court will address it.

To establish a *prima facie* hostile work environment case based on race, Robinson must establish that:

> (1) He is a member of a protected class; (2) He was subjected to unwelcome harassment; (3) The harassment was based on his race; (4) The harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive or intimidating work environment; and (5) There is employer liability.

*Coleman v. Parallon Enters. Inc.*, No. 13-0021, 2017 WL 4349161, at *6 (M.D. Tenn. Sept. 29, 2017) (citing *Hafford v. Seidner*, 183 F. 3d 506, 512 (6th Cir 1999)).

As addressed throughout this opinion, Robinson has various complaints about his employment at CBRE and specifically while working on the Kellogg’s account. He felt the Kellogg’s team disregarded his opinion, blamed him for issues that were not his fault, and singled him out by requiring him to work onsite five days per week. (ECF No. 35-5, PageID.1503, 1506, 1531.) He also faulted his manager for promising him a promotion and then not following through. (ECF No. 35-5, PageID.1493.)

The Court is doubtful that any of his complaints rise to the level of a hostile, offensive or intimidating work environment. But it need not even delve into that analysis for Robinson does not point to any evidence showing that any of this conduct was taken because of his race. “An employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee’s protected class, rather than personal dislike.” *Trepka v. Bd. of Educ.*, 28 F. App’x 455, 461 (6th Cir. 2002). A manager’s “[m]ere personal dislike” of an employee does not constitute an

"actionable hostile work environment" claim. *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 129 (6th Cir. 2007).

Without making such a showing, Robinson's claim for hostile work environment based on race fails as a matter of law.

**VI.**

When working in a client services industry there will be times when the client is displeased with the performance of an agency employee and demands his or her removal from the account or project. If the requested removal is legitimately performance based it will not support a discrimination, retaliation, or harassment claim, That is what occurred here. For the foregoing reasons, the Court GRANTS CBRE's motion for summary judgment (ECF No. 35).

IT IS SO ORDERED.

Dated: September 14, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE